IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| **REGINA RENEE FUQUA,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:19cv548-MHT |
| | ) | (WO) |
| **OFFICER A. DAVIS,** | ) | |
| | ) | |
| Defendant. | ) | |

OPINION

*Pro se* plaintiff Regina Renee Fuqua, an inmate at an Alabama women's prison, brings this lawsuit against defendant Ahmeer Davis, a correctional officer, for subjecting her to excessive use of force and denying her the opportunity to participate in the prison's academic programming, all in violation of the Fourteenth Amendment as enforced through 42 U.S.C. § 1983.

Fuqua sues Davis in both his official and individual capacities. She seeks money damages and injunctive relief. Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights).

Davis has moved for summary judgment, contending that he is shielded from financial liability in his official capacity under the doctrine of absolute immunity. With regard to Fuqua's claims against him in his personal capacity, he requests summary judgment on the basis of qualified immunity and failure to state a claim. *See* Davis's Special Report and Answer (Doc. 20) at 7-8.

In response to an order from the magistrate judge, Davis filed a special report and supporting evidentiary materials addressing Fuqua's claims for relief. The court provided Fuqua a chance to respond, noting that her response should include evidentiary materials necessary to show "sufficient legal cause" for her claims. *See* Magistrate Judge's Order (Doc. 26) at 2. The court directed Fuqua to demonstrate "a genuine issue of material fact for trial" and alerted both parties to the possibility that Davis's report would be treated as a motion for summary judgment. *Id*.

This case is now pending on Davis's motion for summary judgment. Upon consideration of Davis's report, as well as Fuqua's original complaint and subsequent filings, the court concludes that summary judgment should be entered in favor of Davis in full.

## I. SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The court's role at the summary-judgment stage is to view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the

non-moving party, there is no 'genuine [dispute] for trial.'" *Id*. at 586 (internal citations omitted).

The court's role at this stage is not to evaluate the underlying merit of Fuqua's claim or to "determine the truth of the matter," but "to determine only whether a genuine [dispute] exists for trial." *Dunn v. Dunn*, 219 F. Supp. 3d 1100, 1109 (M.D. Ala. 2016) (Thompson, J.).


## II. BACKGROUND

In determining whether to enter summary judgment, the court relies on video footage taken by two surveillance cameras at the Tutwiler Prison for Women, in addition to affidavits filed by both parties.* Upon viewing the footage and reviewing each party's filings, the facts, as viewed in the light most favorable to Fuqua, are as follows.

---

*Fuqua disputes the veracity of the surveillance footage and alleges that it has been manipulated, but she does not provide any evidence to support this claim. *See* Pl.'s Second Resp. (Doc. 27) at 4. From its viewing of the footage, the court does not see anything that would suggest any tampering.

On the morning in question, Davis was monitoring inmates as a "rover" in Tutwiler's Dormitory F. At 9:35 a.m., Fuqua and another inmate approached the door leading out of the dormitory, planning to attend a class being offered elsewhere in the facility. Although Davis unlocked and opened the door, he placed his body in the doorway, preventing Fuqua from passing through. He allowed the second inmate to pass through the door.

Immediately after the second inmate left the dormitory, Davis walked several feet away and watched as Fuqua attempted to catch the attention of individuals on the other side of the door's glass window. Fuqua began knocking on the door and gesturing; she continued to knock on the door for approximately one minute.

The parties do not dispute that Davis gave Fuqua verbal instruction to stop knocking. When Fuqua continued to knock, Davis instructed her to put her hands behind her back and began walking toward her. *See* Fuqua's Unsworn Statement (Doc. 20-11) at 1 ("I was told to put

5

my hands behind my back,"); Aff. Of Inmate Erica Rae Fox (Doc. 18-1) at 1 ("Mr. Davis walked up behind Ms. Fuqua and was yelling at her to get away from the door,"); Davis's Special Report (Doc. 20) at 5 ("Officer Davis . . . commanded Inmate Fuqua to stop behaving in an aggressive manner.").

Surveillance footage taken from two angles shows that Fuqua attempted to move out of the way of Davis's handcuffs. After evading Davis's grasp, she spun around and continued her attempts to knock on the door. At this point, Davis pressed Fuqua forcefully against the door, with his right forearm pressed against the back of her neck.

In her complaint, Fuqua said she experienced this process as being "throwed . . . into a door" and choked. Compl. (Doc. 1) at 3. She further alleges that Davis "twisted [her] arm excessively" and shouted "Bitches, I can't stand your ass" and "Bitch, I got your ass now." Pl.'s Second Resp. (Doc. 27) at 2. Davis does not dispute

6

that he pinned Fuqua's neck to the door with his right forearm in an effort to place her in restraints, but does deny making either statement. *See* Davis's Aff. (Doc. 20-2) at 1-2. Davis alleges that during this process, Fuqua shouted that she was "going to beat [his] muthafucking ass." *Id*.

The parties do not dispute that Fuqua continued to resist Davis's attempts to place her in handcuffs. Davis kept his forearm on the back of Fuqua's neck for roughly ten seconds before using his body to force her onto the ground of the dormitory, which Fuqua describes as being "slammed . . . head first to the floor" (Doc. 1 at 3) and Davis describes as a "two on one takedown maneuver" (Doc. 20-2 at 2). Video footage shows that Fuqua began kicking at the air and convulsing slightly.

At 9:38 a.m., two additional correctional officers entered Dormitory F. All three officers applied pressure to Fuqua's prone body. She continued to kick briefly before she became still. Fuqua alleges that she briefly

7

lost consciousness while being restrained. *See* Pl.'s Second Resp. (Doc. 27) at 3. She was then brought to a standing position with the help of two correctional officers and taken to the Tutwiler Shift Office for further questioning. *See* Duty Officer Report (Doc. 20-3) at 1.

An Inmate Body Chart Documentation Form taken within an hour of Fuqua's altercation with Davis reports "redness noted" on Fuqua's right elbow. *See* Doc. 20-6 at 1. Fuqua alleges that she also reported pain in her back, neck, and head, as well as facial swelling, and that prison medical staff declined to write down these symptoms after her complaints were verbally dismissed by another correctional officer. *See* Pl.'s Second Resp. (Doc. 27) at 3.

## III. DISCUSSION

At the outset, the court again notes that Fuqua seeks money damages and injunctive relief on each of her claims

8

(excessive force and refusal to allow her to participate in the prison's academic programming).  In response, with regard to his personal liability, Davis raises the defense of qualified immunity and asserts a failure to state a claim.  He asserts that Fuqua's claims against him in his official capacity are barred by Eleventh Amendment absolute immunity.

### A. Excessive Force

#### 1. Davis's Defense of Qualified Immunity

Because Fuqua does not successfully provide evidence of a constitutional violation, Davis is, to the extent Fuqua asserts her claim against him in his individual capacity, shielded from money damages by the doctrine of qualified immunity.

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person

9

would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Determining the applicability of qualified immunity on a motion for summary judgment requires two inquiries: whether the evidence before the court "make[s] out a violation of a constitutional right," and whether "the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *Id*. at 232 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). These inquiries can be conducted in any order. *Id*. at 236.

The law of the Eleventh Circuit unambiguously precludes a defense of qualified immunity in cases where a plaintiff alleges excessive force and offers evidence sufficient to survive a motion for summary judgment. *See Skritch v. Thorton*, 280 F.3d 1295, 1301 (11th Cir. 2002) ("There is simply no room for a qualified immunity defense when the plaintiff alleges such a violation."). Under the Eighth Amendment, "excessive force" in a

10

custodial setting is defined as force applied "maliciously and sadistically to cause harm," rather than "in a good faith effort to maintain or restore discipline." *Id*. at 1300.  Because the use of force "maliciously and sadistically to cause harm" is "clearly established to be a violation of the Constitution," the only question, then, is whether the evidence is sufficient to establish the Davis used constitutionally impermissible excessive force. It is not.

In making this inquiry, the court must consider several factors: "The need for the application of force; the relationship between the need and the amount of force that was used; and the extent of the injury inflicted on the prisoner," in addition to "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them, and any efforts made to temper the severity of a forceful response." *Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007).

11

The court must also give "a wide range of deference to prison officials acting to preserve discipline and security." *Bennett v. Parker*, 898 F.2d 1530, 1533 (11th Cir. 1990). "[A] court must keep in mind the paramount concerns of maintaining order and discipline in an often dangerous and unruly environment." *Ort v. White*, 813 F.2d 318, 322 (11th Cir. 1987). Therefore, the court may not "freely substitute [its] judgment for that of officials who have made a considered choice." *Whitley v. Albers*, 475 U.S. 312, 322 (1986).

There is no factual dispute among the parties that Davis instructed Fuqua to back away from the door and to submit to being handcuffed, and there is no factual dispute that Fuqua refused to comply with both directives. *See* Davis's Special Report (Doc. 20) at 5 ("Inmate Fuqua resisted efforts to restrain her,"); Fuqua's Unsworn Statement (Doc. 20-11) at 1 (Fuqua describes "pull[ing] away from Davis").

12

Davis and the other officers had the right to respond to Fuqua's resistance in order to obtain her compliance with Davis's directives. Correctional officers have often been given wide latitude in their ability to enforce their orders, including though force, even when such force might seem disproportionate or unwarranted to a third party. As one example, the Eleventh Circuit ha held that correctional officers can use pepper spray and other chemical agents in attempts to gain inmate compliance, even upon inmates who are not physically resisting (*see Danley v. Allen*, 540 F.3d 1298, 1303-1304 (11th Cir. 2008)). Correctional officers have also used stun guns and bone-breaking force against inmates who were not physically resistance (*see Riggins v. Beseler*, 2013 WL 12086790, at *15 (M.D. Fla. 2013) (Adams, J.) and *Fennell v. Gilstrap*, 559 F.3d 1212, 1218 (11th Cir. 2009). Here, in light of the law of the circuit, the evidence is insufficient to support the conclusion that

13

Davis used excessive force in his effort to get Fuqua to back away from the door and submit to being handcuffed.

Even if Davis had no articulable rationale for denying Fuqua permission to attend class, he still had "a wide range of deference" in order to "preserve discipline and security." *See Cockrell*, 510 F.3d at 1311; *see also Danley*, 540 F.3d 1307 ("Prison guards do not have the luxury or obligation to convince every inmate that their orders are reasonable and well-thought out."), overruled in part on other grounds by *Randall v. Scott*, 610 F.3d 701, 709 (11th Cir. 2010). Fuqua had no right to physically resist Davis. Even if Fuqua *had* received prior permission to leave the dormitory, she did not have a right to ignore or reject direct commands from Davis. *See Bennett*, 898 F.2d at 1530-1533.

The extent of Fuqua's injuries is a matter of dispute. Fuqua alleges that immediately following the altercation with Davis, she experienced pain in her back, neck, and head, as well as facial swelling. *See* Pl.'s

14

Second Resp. (Doc. 27) at 3. She adds that for several months afterwards, she experienced sharp, sporadic back pain, worsening vision, memory loss, and loss of "some hearing" in her left ear. *See* Pl.'s First Resp. at 3 (Doc. 24). She contends that she was unable to secure an appointment with prison medical staff for further testing regarding her hearing. *See* Doc. 27 at 3. In his response, Davis asserts that Fuqua's injuries were "minor," noting that prison medical records taken after the altercation show only "a red elbow." Doc. 20 at 5-6.

"The extent of the injury suffered by the inmate is only one of the many factors that should be considered," and "not a decisive one." *Leslie v. Greene*, 2015 WL 427019, at *6 (M.D. Ala. 2015) (Coody, M.J.), adopted, *id.* at *1 (Thompson, J.). Here, viewing them in Fuqua's favor, the court must conclude that the evidence is still insufficient to find that Davis's effort to get Fuqua to back away from the door and to submit to being handcuffed violated the Constitution.

15

It bears mentioning that at several points in her filings, Fuqua, a *pro se* plaintiff, alludes to a broader context of animosity in her relationship with Davis. *See* Pl.'s Second Resp. (Doc. 27) at 3 ("Evertime [sic] Officer Davis was on duty in F dorm he would migrate to my bunk and pick with me. There is negative history between [us] . . . not recorded on video."); Pl.'s First Resp. (Doc. 24) at 7 ("A. Davis . . . terrorized me days after the use of force for no specific reasoning."). It is unclear whether Fuqua intends to offer her "negative history" with Davis as proof that he was acting maliciously on July 18, 2019. The court recognizes that prior interactions between a correctional officer and an inmate could be submitted as relevant evidence of malicious or sadistic intent. In this case, however, even against this backdrop, the evidence of Davis's reaction to Fuqua's non-compliance does not support an unconstitutional exercise of force.

Fuqua also submits that Davis swore at her during their altercation. *See* Pl.'s Second Resp. (Doc. 27) at 2 ("Bitches, I can't stand your ass" and "Bitch, I got your ass now"). Even if the court takes these alleged statements as true, they are not enough to establish that Davis used impermissible force in his effort to get Fuqua to comply with his directives.

### 2. Fuqua's Request for Injunctive Relief

In addition to money damages, Fuqua requests injunctive relief, asking that Davis be banned from continued employment in the Alabama prison system. *See* Compl. (Doc 1.) at 2. Because Fuqua does not establish a constitutional violation, she is not entitled to an equitable remedy. *See Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 16 (1971).

### 3. Davis's Defense of Absolute Immunity

To the extent that Fuqua sues the Davis in his official capacity, he is immune from money liability. Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). "A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe [of Florida] v. Florida*, 517 U.S. 44, 59 (1996). Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence, Ala.*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity. Therefore, Alabama state officials are immune from claims brought against them in their official capacities." *Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1429 (11th Cir. 1997).

For these reasons, Davis is a state official entitled to absolute immunity under the Eleventh Amendment for claims seeking monetary damages from him in his official capacity. *Lancaster*, 116 F.3d at 1429.


B. Denial of Participation in Class

Fuqua alleges that her Fourteenth Amendment rights were abridged when she was "deprived of any personal life, liberty, or [pursuit] of happiness." *See* Compl. (Doc. 1) at 3.  In support of this claim, Fuqua provides only that Davis erroneously prevented her from attending a class.  Construing the *pro se* plaintiff's complaint liberally, as it is required to do, the court nevertheless concludes that the evidence is insufficient to support a claim here.  *See Barbour v. Haley*, 471 F.3d 1222 (11th Cir. 2006).  Davis is entitled to summary judgment here.

19

**\*\*\***

**The court will enter an appropriate summary judgment in favor of Davis of both of Fuqua's claims.**

**DONE, this the 23rd day of September, 2022.**

                      /s/ Myron H. Thompson
                      **UNITED STATES DISTRICT JUDGE**